| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE TIPPECANOE CIRCUIT COURT |
| | ) SS: | |
| TIPPECANOE COUNTY | ) | CAUSE NO. 79C01-1904-PL-_____ |

| | |
|---|---|
| LANDIS+GYR, LLC., f/k/a LANDIS & GYR METERING, INC., ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | **JURY TRIAL DEMANDED** |
| LIBERTY MUTUAL INSURANCE COMPANY, NATIONAL INDEMNITY COMPANY, and RESOLUTE MANAGEMENT, INC., ) ) ) ) ) | |
| Defendants. ) | |

# COMPLAINT

Plaintiff, Landis+Gyr, LLC, by and through counsel, and for its Complaint and Demand for Jury Trial states as follows:

## INTRODUCTION

1. This is an action for damages and declaratory relief arising out of the wrongful refusal to pay and bad faith handling of a long-standing environmental liability claim. Plaintiff seeks to recover monies it has expended to investigate and respond to an environmental liability claim relating to a Resource Conservation and Recovery Act ("RCRA") surface impoundment waste management unit located at 3601 Sagamore Parkway North, Lafayette, Indiana 47903 ("Site").

2. Landis+Gyr, LLC ("Landis & Gyr") and its predecessors have expended millions of dollars over the years through a lengthy series of actions to investigate and remediate

contamination at the Site in response to demands from the Indiana Department of Environmental Management ("IDEM") and the United States Environmental Protection Agency ("USEPA") (hereinafter referred to as the "Claim"). Therefore, Landis+Gyr brings this action to hold the Defendants liable, to obtain restitution and recovery, and to restore those affected.

## PARTIES

3. Plaintiff, Landis+Gyr, is a Delaware limited liability company whose principal place of business is located at 30000 Mill Creek Avenue, Suite 100, Alpharetta, Georgia 30022.

4. At all times material hereto, Landis+Gyr and its predecessor entities were conducting business in the State of Indiana.

5. Landis+Gyr is the successor to Duncan Electric Company, Inc., which officially changed its corporate name to Landis & Gyr Metering, Inc. following a stock purchase by Landis+Gyr's predecessor entity, Duncan Electric Company.

6. At all times material hereto, the principal headquarters for the metering operations of Landis+Gyr and its predecessor entities was located in Tippecanoe County, Indiana, at 3601 Sagamore Parkway North, Lafayette, Indiana 47903.

7. Defendant Liberty Mutual Insurance Company ("Liberty Mutual") is a Massachusetts corporation with its principle place of business at 175 Berkeley Street, Boston, Massachusetts 02116. Liberty Mutual is registered to do business in the State of Indiana.

8. Defendant National Indemnity Company ("NICO") is a Nebraska corporation with its principle place of business at 1314 Douglas Street, Suite #1400, Omaha, Nebraska 68102. On or about July 14, 2014, NICO issued a finite reinsurance policy to Liberty Mutual, covering, among other things, its "long tail" environmental losses, which are at issue here. NICO is registered to do business in the State of Indiana.

9. Defendant Resolute Management, Inc. ("Resolute") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1000 Washington Street, 4th Floor, Boston, Massachusetts, 02118. From at least October 2, 2017 onwards, Resolute was licensed to do business, and was and is conducting and transacting business, in the State of Indiana.

## JURISDICTION AND VENUE

10. The cause of action, as alleged in this Complaint, arose, in whole or in part, in the County of Tippecanoe, in the State of Indiana.

11. Venue is proper pursuant to Indiana Rule of Trial Procedure 75(A)(2).

## STATEMENT OF FACTS

12. Liberty Mutual issued primary general liability insurance and umbrella liability insurance policies in which Duncan Electric Company, Inc., now known as Landis+Gyr, LLC, was a named insured.

13. The Liberty Mutual insurance policies implicated in this Complaint include at least the following (collectively, "Identified Policies"):

| Policy No. | Coverage Period | Policy Limits |
|---|---|---|
| Primary Policy LG1-141-013902-020 | 10/01/70 – 10/01/71 | $1,000,000 |
| Primary Policy LG1-141-013902-021 | 10/01/71 – 10/01/72 | $1,000,000 |
| Primary Policy LG1-141-013902-022 | 10/01/72 – 10/01/73 | $1,000,000 |
| Primary Policy LG1-141-013902-023 | 10/01/73 – 10/01/74 | $1,000,000 |
| Umbrella Policy LE1-141-013902-083 | 04/19/73 – 04/19/74 | $10,000,000 |
| Umbrella Policy LE1-141-013902-084 | 04/19/74 – 10/01/74 | $10,000,000 |
| Primary Policy LG1-141-013902-024 | 10/01/74 – 10/01/75 | $1,000,000 |

| Umbrella Policy LE1-141-013902-104 | 10/01/74 – 10/1/75 | $10,000,000 |
| Primary Policy LG1-141-013902-025 | 10/01/75 – 10/01/76 | $1,000,000 |
| Umbrella Policy LE1-141-013902-105 | 10/01/75 – 10/01/76 | $10,000,000 |
| Primary Policy LG1-141-013902-026 | 10/01/76 – 10/01/77 | $1,000,000 |
| Umbrella Policy LE1-141-013902-106 | 10/01/76 – 10/01/77 | $10,000,000 |

True and accurate copies of an exemplar primary policy and an exemplar umbrella policy are attached hereto as Exhibits A and B respectively. Additional policies are too voluminous to attach, but can be made available upon request.

14. Upon information and belief, Liberty Mutual provided insurance coverage to Landis+Gyr's predecessor, Duncan Electric, for additional policies ("Unidentified Policies") (collectively the "Identified Policies" and "Unidentified Policies" are hereinafter referred to as "Policies"). To date, Liberty Mutual has not provided Landis+Gyr with copies of these Unidentified Policies.

15. Liberty Mutual was timely notified of the environmental liability claims pertaining to the Site.

16. Liberty Mutual dragged its feet and failed to agree to participate in the defense of the environmental claims in question and has quit responding to requests for reimbursement.

17. In Liberty Mutual's absence, Landis+Gyr settled with another liability insurer, and this settlement exhausted the policy limits of at least three of the Liberty Mutual primary policies.

18. Landis+Gyr advised Liberty Mutual of this settlement and the exhaustion of at least three of Liberty Mutual's primary policies, but Defendants continued to ignore the requests of their policyholder.

4

## Liberty Mutual's Retroactive Reinsurance Contract with NICO

19. On July 14, 2014, Liberty Mutual, without Landis+Gyr's knowledge, entered into an agreement with defendant NICO of a special type, an insurance transaction known as retroactive reinsurance ("Retroactive Reinsurance"). Retroactive Reinsurance is the bundling of already-declared insurance policies with a "long-tail" payment prospect that are ceded to a Retroactive Reinsurer, either for a contingency, or premium, or fee to a Retroactive Reinsurer. The cedant gains the regulatory advantage, balance sheet benefit, or peace of mind of no longer bearing primary obligation on the risk. The Retroactive Reinsurer gains compensation based on the spread between any claims that were declared, and those claims that are paid—or such other calculation. This Retroactive Reinsurance Agreement was announced on July 14, 2014. Liberty Mutual asserted that:

> At the closing of this transaction today, but effective as of January 1, 2014, Liberty Mutual Insurance ceded approximately $3.3 billion of existing liabilities under a retroactive reinsurance agreement. NICO will provide approximately $3.2 billion of additional aggregate adverse development cover. Liberty Mutual Insurance paid NICO total consideration of approximately $3.0 billion.
>
> The agreement covers Liberty Mutual Insurance's potentially volatile U.S. asbestos and environmental liabilities arising under policies of insurance and reinsurance with effective dates before January 1, 2005, as well as Commercial Insurance's workers compensation liabilities as respects injuries or accidents occurring before January 1, 2014.
>
> NICO will assume responsibility for claims handling related to Liberty Mutual Insurance's asbestos and environmental claims. Liberty Mutual Insurance will continue to handle all workers compensation claims.

July 14, 2014 Liberty Mutual Press Release, a true and accurate copy of which is attached hereto as Exhibit C.

20. NICO is a subsidiary of Berkshire-Hathaway Reinsurance which is itself a subsidiary of Berkshire-Hathaway, Inc. NICO is one of the most prolific providers of Retroactive

5

Reinsurance agreements in the world. NICO's parent, Berkshire Hathaway, commented on the Liberty Mutual Retroactive Reinsurance agreement in its 2015 annual report to its shareholders, indicating that it received $3 billion for this Retroactive Reinsurance transaction. Berkshire-Hathaway, Inc., 2015 Annual Report, at 80, a true and accurate copy of which is attached hereto as Exhibit D.

21.   As a result of these financial transactions, Defendants have a $300 million financial incentive to delay payment or avoid payment.

22.   The liabilities were estimated to cost $3.3 billion.

23.   The price paid for insuring or "buying" these liabilities was $3 billion.

24.   The buyers of these liabilities are gambling that they can delay or avoid payment long enough so that their investment returns more than make up for this $300 million delta.

25.   NICO's Retroactive Insurance objectives were plainly stated by the Chairman and CEO of Berkshire Hathaway, Warren Buffett, in that 2006 Annual Report where he advised that the key to huge profits was to acquire insurance companies with sizeable reserves to create float. Berkshire Hathaway, Inc., 2006 Letter to Shareholders, at p. 9-10, a true and accurate copy of which is attached hereto as Exhibit E.

26.   In Berkshire-Hathaway's 2015 Annual Report, Mr. Buffett explained that float is "money that does not belong to us [Berkshire] but that we can invest for Berkshire's benefit." Ex. D., at 5. Mr. Buffett further advised that "float generates significant investment income because of the assets it allows us to hold." *Id*.

27.   Paying out claims decreases the amount of the float and, thus, reduces Berkshire's investment returns. To combat this decrease, Berkshire has analyzed the time value of money and determined the speed at which it can pay out claims. Such behavior incentivizes Resolute, at

the behest of NICO, to delay decision making and pay legitimate claims as slowly as possible to maintain its float and related investment income—all at the expense of a policyholder like Landis+Gyr.

28. As Berkshire has said in its 2015 Shareholders' Letter, any decline in float, "will be *very* gradual . . . [because] [t]he nature of our insurance contracts is such that we can *never* be subject to immediate or near-term demands for sums that are of significance to our cash resources. This structure is by design and is a key component in the strength of Berkshire's economic fortress. It will *never* be compromised." *Id*. at 10 (emphasis theirs). In making this proclamation, Mr. Buffett laid bare NICO's strategy: to delay payment of claims in order gradually reduce "float;" maintain the strength of its "economic fortress;" and, ultimately, to hold on to as much "float" as possible to increase its investment income. Resolute is an integral and necessary part to implement this strategy.

29. Mr. Buffett has frequently opined on Retroactive Reinsurance Agreements in his reports to Berkshire Hathaway shareholders and has repeatedly identified them as sources of significant investment income. For example, Mr. Buffett's 2006 letter to the Berkshire Hathaway shareholders provides great insight into NICO's business model. In examining one featured Retroactive Reinsurance contract issued to Equitas, Buffett explained that NICO's profitability would be determined by how much the "'known' claims will end up costing us, how many [sic] yet-to-be-presented claims will cost, and how soon claim payments will be made and how much we earn on the cash we receive before it must be paid out. [Management] and I think the odds are in our favor. And should we be wrong, Berkshire can handle it." Ex. E, at 9.

30. Despite these many public pronouncements about their new financial arrangements, Defendants routinely refuse to produce to their policyholders the actual paperwork

7

and agreements between themselves that define their commitments and obligations to one another.

### Resolute's Involvement as a Third Party Administrator

31. By virtue of its Retroactive Reinsurance agreement with NICO, Liberty Mutual shed all or part of the bottom-line obligations to Landis+Gyr incurred until the time of the Retroactive Reinsurance agreement. Landis+Gyr was unaware of this. Under this transaction, Liberty Mutual paid NICO and gave up complete or partial financial control in the Landis+Gyr policies to NICO in a fashion prescribed by the Retroactive Reinsurance contract. In return, NICO agreed to assume Liberty Mutual's obligation to pay Landis+Gyr under the Liberty Policies, in part or in full.

32. After this transaction, Liberty Mutual abdicated its duties to its policyholder under the policies at issue in the Retroactive Reinsurance Agreement. Therefore, while Liberty Mutual's name might have been on the policies, Liberty Mutual contractually sought to absolve itself of its duties to its policyholders while profiting off of the premiums those policyholders paid.

33. The Liberty Mutual/NICO Retroactive Reinsurance contract also permitted NICO to assume the right to control Liberty Mutual's claims function. This meant that NICO, through its agents and attorneys, controlled Liberty Mutual's entire claims process, including deciding what Landis+Gyr claims Liberty Mutual would pay, the manner in which these claims would be paid, how the claims would be handled, and whether Liberty Mutual would deny or pay a Landis+Gyr claim arising from the Liberty Mutual Policies.

34. With Liberty Mutual completely out of Landis+Gyr's day-to-day claims processes, and Liberty Mutual disinterested in selling future liability insurance to Landis+Gyr,

the party now in control of paying Landis+Gyr's Claim—NICO—did not have any incentive to act fairly to Landis+Gyr, or to conduct Landis+Gyr's claims-paying process to professional and accepted standards of good faith and fair dealing.

35. Mr. Buffett has consistently warned that maintaining adequate "float" is important to increase Berkshire Hathaway's profits as significant investment income is generated from investing that "float," which is "money that doesn't belong to [Berkshire Hathaway] but that we can invest for Berkshire's benefit". *See e.g.* Ex. D, at 5.

36. As stated in Berkshire Hathaway's 2015 Annual Report, Mr. Buffett expected Berkshire Hathaway's profits from its Retroactive Reinsurance program to steadily decrease because its "float drifts downward." *Id*. at 10. This is because the Retroactive Reinsurance program does not write new business—it only pays claims. *Id.* Accordingly, NICO and its wholly owned subsidiary, Resolute, are incentivized to delay payment of any pending claims so that the "float" remains at elevated levels. Under this business model NICO and Resolute are not incentivized to timely pay their claims since the longer NICO is able to hold onto the "float" the more investment income it can make.

37. Upon information and belief, Defendants sought to enlarge their profits by stalling the handling, response and any payment of Landis+Gyr's Claim. NICO and Liberty Mutual, through Resolute, also suppressed claims review activity that was pushing timely payment obligations to Landis+Gyr, and used their agents and attorneys to adopt a litigation-driven posture that choked off payments on Landis+Gyr's Claim, even though neither NICO, Resolute, nor Liberty Mutual has expressed a coverage position for refusing to pay this Claim to Landis+Gyr.

38. NICO employs its wholly owned subsidiary, Resolute, to control Liberty Mutual's claims function. Resolute identifies itself as a "third party administrator" that handles, administers, makes coverage decisions and "processes" insurance claims for insurance companies, including, without limitation, Liberty Mutual.

### Continuing Coverage Correspondence with Resolute

39. On September 1, 2017, Landis+Gyr provided an update to Liberty Mutual on the status of the IDEM mandated investigation and remediation of the Site. In this letter, Landis+Gyr requested that Liberty Mutual provide it with its past and updated coverage position with respect to this Claim. It also requested copies of the claims file for this matter and copies of all of the insurance policies Liberty Mutual issued either to Duncan Electric Company or to Landis+Gyr.

40. Even though Landis+Gyr sent this letter to Liberty Mutual, Liberty Mutual did not respond. Rather, on October 2, 2017, Resolute advised that, due to agreement entered into between Liberty Mutual and NICO, Liberty Mutual has appointed Resolute to handle and resolve the Claim Landis+Gyr submitted for coverage. In this communication, Resolute only provided Landis+Gyr with a subset of the policies listed above in Paragraph 12. Resolute also did not provide copies of any of the Unidentified Policies. Resolute also made several, detailed document requests that it claimed were necessary to evaluate whether coverage is available under the Policies for the Claim.

41. Landis+Gyr supplied Resolute with the various documents it needed to evaluate whether coverage is available under the Policies for the Claim.

42. Landis+Gyr substantially cooperated with each of Resolute's requests for additional information.

43. In the intervening year and a half, Landis+Gyr repeatedly requested that Resolute, acting on behalf of Liberty Mutual, respond to the claim and provide Landis+Gyr with Liberty Mutual's coverage analysis and the other requested information.

44. To date, neither Liberty Mutual nor Resolute has provided Landis+Gyr with a coverage position.

45. Both Liberty Mutual and Resolute have continued to drag their feet and have refused to date to reimburse Landis+Gyr.

46. Moreover, for the past year and a half, Landis+Gyr repeatedly requested information from Resolute, acting on behalf of Liberty Mutual, including:

- All previous coverage correspondence about this environmental claim, including Liberty Mutual's communications with Landis+Gyr in the 1980s and 90s;
- All policies issued to Landis+Gyr and/or its predecessor, Duncan Electric;
- All underwriting files related to the Policies;
- Any claims files about the Site; and
- Liberty Mutual's document retention policies.

Landis+Gyr also requested any other information that Liberty Mutual might have regarding the claim or historical communications it had with Duncan Electric about placement of the Unidentified Policies. Resolute never provided Landis+Gyr with any of this requested documentation.

47. Defendants have continuing legal duties to Landis+Gyr under Indiana's Unfair Claim Settlement Practices Act.

## BREACH OF CONTRACT

48. Landis+Gyr realleges and incorporates the allegations set forth in the paragraphs above as if fully pled here.

49. Landis+Gyr complied with the requirements regarding timely notice of claims as provided in the Policies.

50. Landis+Gyr has performed fully its obligations under the Policies, including payment of premiums, save and except only those obligations (if any) excused by the material breaches of the Policies by Defendants.

51. Liberty Mutual is bound by the terms of the Policies and applicable law to pay 100% of Landis+Gyr's unreimbursed defense and indemnity costs pertaining to the Claim, plus interest and costs.

52. Liberty Mutual has acted in bad faith and has materially breached its contractual obligations under the Policies. As a direct and proximate result, Landis+Gyr paid millions of dollars that are rightfully Liberty Mutual's responsibility under the Policies.

53. From 2014 onwards, by virtue of an agreement between NICO and Liberty Mutual, Resolute assumed responsibility as the "third party administrator" for the Claim. These actions were taken without the consent of Landis+Gyr. Resolute now performs the roles that more suitably, and traditionally, had been performed by Liberty Mutual, including claims handling, adjusting claims, and issuing coverage opinions on behalf of Liberty Mutual and otherwise interfacing with policyholders.

54. Upon information and belief, Resolute also took control over the following business operations of Liberty Mutual:

- Resolute is responsible for commencing, conducting, defending, pursuing, prosecuting, settling, appealing or compromising claims and litigation filed by Liberty Mutual policyholders, such as Landis+Gyr, against Liberty Mutual.

- Resolute is responsible for developing and implementing all of Liberty Mutual's strategic decisions in addressing issues raised by its policyholders, such as Landis+Gyr.

- Resolute is responsible for hiring the attorneys to represent Liberty Mutual in coverage litigation with its policyholders, such as Landis+Gyr.

- Resolute is responsible for deciding whether, and for what amount, Liberty Mutual will resolve claims asserted against it by policyholders, such as Landis+Gyr.

- Resolute is responsible for deciding whether, and to what extent, Liberty Mutual will assert contribution or subrogation rights against other insurance companies.

55. Even though Landis+Gyr complied with the terms of the Policies, Resolute, ostensibly on behalf of Liberty Mutual and at the direction of NICO, has failed and refused, and continues to fail and refuse, to pay or reimburse Landis+Gyr all or any part of the costs for the Claim, or to provide any explanation or justification for the refusal to pay.

56. Liberty Mutual, through Resolute and at the direction of NICO, breached its contractual obligations to its insured.

57. Landis+Gyr has been damaged by Liberty Mutual's breaches of contract, and Landis+Gyr is entitled to damages to compensate for its losses.

58. Despite notice and demand, Liberty Mutual has failed to cure its breaches.

59. As a result of the continuing breaches of Liberty Mutual, Landis+Gyr has incurred and is continuing to incur attorneys' fees and expenses associated with its attempts to get Liberty Mutual to honor its contractual obligations.

## BAD FAITH

60. Landis+Gyr realleges and incorporates the allegations set forth in the paragraphs above as if fully pled here.

61. Upon information and belief, at the direction of NICO, Resolute has "handled" the Claim in a manner whose sole purpose is to delay payment of millions of dollars, so that its parent NICO would not have to pay out some of their reinsurance funds owed for Liberty Mutual's losses.

62. As detailed above, Defendants were motivated by bad faith and ill will, and by improper motives by refusing to reimburse Landis+Gyr for the Claim and otherwise failing to respond to Landis+Gyr's coverage correspondence.  They knew better, and knowingly continued to delay the adjustment of the claim so that Defendants could continue to invest the "float" while disregarding Landis+Gyr's rights under the Liberty Mutual Policies.

63. Liberty Mutual improperly delegated its duties to NICO and Resolute.

64. Defendants had no rational basis for failing to provide Landis+Gyr with their coverage analysis.

65. Defendants have failed to acknowledge the exhaustion of certain of the Liberty Mutual primary policies, and have acted as if Liberty Mutual never issued years and years of umbrella policies.

66. Defendants' engaged in at least the following, non-exhaustive, list of improper conduct:

- Defendants have failed to acknowledge or act reasonably in promptly communicating with Landis+Gyr about the adjustment of the Claim;

- Defendants have caused an unfounded delay in making payment under the Liberty Mutual Policies;

- Defendants have failed to adopt and implement reasonable standards for the prompt investigation of the Claim, failing to provide Landis+Gyr with its coverage position after over 19 months of "investigation;"

- Defendants have failed to provide Landis+Gyr with copies of all policies Defendant Liberty Mutual issued to Landis+Gyr as well as all coverage correspondence exchanged between either Liberty Mutual or Resolute and Landis+Gyr.

Landis+Gyr expects to uncover additional improper conduct as discovery continues in this case.

67. Upon information and belief, Resolute, at the direction of NICO, has delayed providing Landis+Gyr with a coverage analysis under the Policies for the Claim and, in bad faith, has refused to reimburse Landis+Gyr so that Defendants could further profit off of the Liberty Mutual Retroactive Reinsurance agreement.

68. As a result of Defendants' improper conduct, Landis+Gyr was required to institute litigation in order to collect amounts due and owing.

69. Landis+Gyr has been harmed by, and has suffered damages as a result of the Defendants' conduct.

70. Defendants' conduct is in breach of their legal duties under the Indiana Unfair Claims Settlement Practices Act.

71. As a direct and proximate result of Defendants' breaches of the duty of good faith and fair dealing, Landis+Gyr is entitled to recover amounts to be determined at the trial of this matter, in addition to interest and Landis+Gyr's costs and attorneys' fees.

72. Defendants' conduct warrants an award of punitive damages against them. The handling of the claim and failures to pay insurance benefits due and owing to Landis+Gyr were conscious decisions, made with ill will, malice, fraud, gross negligence or oppressiveness which was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence or other human failing.

73. The public interest will be served by the deterrent effect that an award of punitive damages would have upon Defendants' future conduct and parties similarly situated.

## TORTIOUS INTERFERENCE

74. Landis+Gyr realleges and incorporates the allegations set forth in the paragraphs above as if fully pled here.

75. Upon information and belief, NICO and Resolute have tortiously interfered with Landis+Gyr's rights under the Liability Insurance Policies or, alternatively, Resolute has, as the agent for Liberty Mutual, caused or induced the breach of these agreements by Liberty Mutual in order to harm Landis+Gyr.

76. As detailed above, Defendants NICO and Resolute knew about the existence of the Liberty Mutual Policies and Liberty Mutual's obligations to Landis+Gyr under the Policies.

77. Defendants NICO and Resolute, surreptitiously and without notice to Landis+Gyr, intentionally induced Liberty Mutual to breach the Policies it issued to Landis+Gyr.

78. This interference was not justified, but rather done surreptitiously, maliciously, with full knowledge of Liberty Mutual's fiduciary obligations to Landis+Gyr, and was exclusively directed to the injury of Landis+Gyr and insureds like it.

79. Landis+Gyr has been damaged from this tortious interference because the costs, fees, interest, and expenses it incurred in responding to the Claim have not been reimbursed and it continues to incur substantial costs in order to collect the amounts due and owing.

80. Defendants' tortious conduct warrants an award of punitive damages against them. Defendants' conduct was done with ill will, malice, fraud, gross negligence or oppressiveness which was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence or other human failing.

81. The public interest will be served by the deterrent effect that an award of punitive damages would have upon Defendants' future conduct and parties similarly situated.

## DECLARATORY JUDGMENT

82. Landis+Gyr realleges and incorporates the allegations set forth in the paragraphs above as if fully pled here.

83. Liberty Mutual has failed and refused to pay amounts due and owing to Landis+Gyr under the Policies and it has breached the insurance contracts all as identified herein.

84. Liberty Mutual denies that it has breached the insurance contracts and it denies that it has failed and refused to pay amounts due and owing to Landis+Gyr under the Policies.

85. Liberty Mutual and the Defendants continue to handle the claim in bad faith.

86. An actual and justiciable controversy exists between Landis+Gyr and the Defendants, including Liberty Mutual, Resolute and NICO regarding the parties' rights and obligations.

87. Landis+Gyr is entitled to a declaratory judgment pursuant to IC § 34-14-1-1 *et seq.* resolving the parties' dispute and declaring the parties' rights and responsibilities with respect to the Policies and all of the issues raised herein.

## NOTICE OF ALL CLAIMS AND CAUSES OF ACTION

88. Landis+Gyr realleges and incorporates the allegations set forth in the paragraphs above as if fully pled here.

89. Landis+Gyr gives notice that it intends to bring all claims and causes of action that are available under the applicable law and that arise out of the facts set forth above.

## PRAYER FOR RELIEF

WHEREFORE, LANDIS+GYR respectfully prays for judgment against Defendants as follows:

1. Enter a judgment declaring the parties' rights and obligations;

2. Enter a judgment in favor of Landis+Gyr and against the Defendants such that the Defendants must reimburse Landis+Gyr fully;

3. Order the Defendants to compensate Landis+Gyr for its damages, costs, expenses and attorneys' fees, plus prejudgment and post-judgment interest at the statutory rate;

4. Award Landis+Gyr its consequential damages and punitive damages as provided by Indiana law; and

5. Award Landis+Gyr all other just and proper relief.

Dated:  April 23, 2019 

Respectfully submitted,

ICE MILLER, LLP

/s/*Brent W. Huber*
Brent W. Huber (#16077-53)
Robert A. "Louie" Jorczak (#32027-29)
One American Square
Suite 2900
Indianapolis, IN 46282-0200
(317) 236-2100
Brent.Huber@icemiller.com
Louie.Jorczak@icemiller.com

*Attorneys for Plaintiff Landis+Gyr, LLC*

## JURY DEMAND

Plaintiff, Landis+Gyr, LLC, demands a trial by jury on any issue in the foregoing Complaint so triable.

Respectfully submitted,

/s/*Brent W. Huber*